**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|                                        |   |                                      |
|----------------------------------------|---|--------------------------------------|
| AMERICAN BROADCASTING COMPANIES, INC., | ) |                                      |
|                                        | ) |                                      |
| *and*                                  | ) |                                      |
|                                        | ) |                                      |
| BENJAMIN GITTLESON,                    | ) | Civil Action No. 1:20-cv-01568 (CJN) |
|                                        | ) |                                      |
| Plaintiffs,                            | ) |                                      |
|                                        | ) |                                      |
| v.                                     | ) |                                      |
|                                        | ) |                                      |
| U.S. DEPARTMENT OF THE TREASURY,       | ) |                                      |
|                                        | ) |                                      |
| Defendant.                             | ) |                                      |
|                                        | ) |                                      |

## DECLARATION OF MICHELLE A. DICKERMAN

I, Michelle A. Dickerman, declare the following to be a true and correct statement of facts:

1.      I am Deputy Assistant General Counsel for Litigation, Oversight, and Financial Stability in the Banking and Finance section of the Office of the General Counsel at the Department of the Treasury (Department or Treasury). I work on a diverse set of legal issues, including Freedom of Information Act (FOIA) litigation.

2.      The purpose of this declaration is to explain the Department's processing of Plaintiffs' FOIA request (Request) since the date this lawsuit was filed. The statements made are based upon my personal review of the documents produced in this case and upon information furnished to me in the course of my official duties. I am familiar with efforts made by Department personnel to process the Request.

3.      On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Public Law 116-136, 134 Stat. 281 (2020), was signed into law. Section 2201 of the CARES Act added a new section, Section 6428, to the Internal Revenue Code (Code), providing a

tax year 2020 credit that will ultimately be claimed or reconciled on a taxpayer's 2020 income tax return.  26 U.S.C. § 6428. The CARES Act also provides for advance payments of this 2020 tax credit, commonly referred to as "Economic Impact Payments" (EIPs).  *See* 26 U.S.C. § 6428(f). Beginning on April 15, 2020, the Treasury Department and two of its bureaus -- the Bureau of the Fiscal Service and the Internal Revenue Service – distributed a total of approximately $170 billion in EIPs under the CARES Act.

4.      Plaintiffs' Request, dated April 16, 2020, sought "access to and copies of all e-mail communication, meeting notes, and other relevant records concerning the decision to print President Donald Trump's name on Economic Impact Payment checks disseminated to Americans as part of stimulus, or relief, related from the impact of the COVID-19 pandemic." Pls.' Compl. ¶ 15.  A true and accurate copy of the Request is attached hereto as Exhibit A.  It further requested "access to and copies of all records regarding that decision, including but not limited to communications between Treasury Department officials, Internal Revenue Service officials, and White House officials." *Id* ¶ 16.

5.      In addition to disclosure of responsive documents, Plaintiffs asked for expedited processing as well as the waiver of any fees associated with their Request. *Id.* ¶ 17-18.

6.      On April 28, 2020, Treasury issued a letter acknowledging receipt of Plaintiffs' Request. *Id.* ¶ 21 & Ex. 1.  A true and accurate copy of Treasury's acknowledgement letter is attached hereto as Exhibit B.  The letter explained that Plaintiffs' request for a fee waiver would be evaluated after Treasury had assessed whether costs associated with the Request would exceed $25. Pls.' Compl. Ex. 1.

7.      Treasury's initial response letter also communicated the Department's denial of Plaintiffs' request for expedited processing. *Id.*  The letter explained that expedited treatment is merited under Treasury regulations only when "(1) . . . lack of expedited treatment 'could reasonably be

expected to pose an imminent threat to the life or physical safety of an individual;' or (2) where there is an 'urgency to inform the public about an actual or alleged Federal Government activity[], if made by a person primarily engaged in disseminating information'" and that Plaintiffs' Request did not meet either of these standards. *Id.*

8.      Plaintiffs filed their Complaint on June 15, 2020, seeking, among other things, injunctive and declaratory relief requiring immediate processing and disclosure of records responsive to their Request. *See generally* Pls.' Compl., ECF No. 1.

9.      To fulfill Plaintiffs' Request, Treasury performed a thorough search for responsive documents. Treasury first obtained documents identified as potentially responsive from the staff of the Office of the Fiscal Assistant Secretary, the unit most centrally involved with the decision at issue in the Plaintiffs' Request.

10.     Treasury then supplemented the results of that initial search with an electronic search for records by pulling the Microsoft Outlook email files of individuals identified as potential custodians of documents responsive to Plaintiffs' Request. To perform the electronic search, Treasury identified a date range beginning on March 27, 2020 (the date on which legislation authorizing the EIP checks became law) and ending on April 17, 2020 (after EIP distribution began), as well as 17 individuals across seven offices at Treasury's Departmental Offices identified as potentially having responsive documents. The relevant individuals during the identified period include the Treasury Secretary; the Fiscal Assistant Secretary and pertinent members of his Office; the Assistant Secretary for Tax Policy; the Assistant Secretary for Management; pertinent members of the Chief of Staff's Office; the Assistant Secretary for Public Affairs and pertinent members of her Office; and the General Counsel and pertinent members of his Office. Treasury then searched for documents in these individuals' custodial files from the relevant period that contained permutations of the terms "EIP"; "Economic Impact

Payment"; "check"; "President" or President's"; "memo"; "line"; "field"; "signature"; "mockup," "mock-up" or "mock up"; "image"; and "memo line."[1]

11.     Since this litigation commenced, Treasury has made five productions of documents to Plaintiffs.  On September 30, 2020, Treasury made its first production to Plaintiffs, consisting of 388 responsive pages, portions of which Treasury explained that it had withheld pursuant to FOIA Exemption 6.  A true and accurate copy of the letter accompanying this production is attached hereto as Exhibit C.

12.     On October 30, 2020, Treasury made its second production to Plaintiffs, consisting of 326 responsive pages, portions of which Treasury explained that it had withheld pursuant to FOIA Exemptions 5 and 6.  A true and accurate copy of the letter accompanying this production is attached hereto as Exhibit D.

13.     On December 1, 2020, Treasury made its third production to Plaintiffs, consisting of 78 responsive pages, portions of which Treasury explained that it had withheld pursuant to FOIA Exemptions 5 and 6.  A true and accurate copy of the letter accompanying this production is attached hereto as Exhibit E.

---

[1] These search-term permutations took the following specific forms:
Search 1: ("EIP or "Economic Impact Payment") AND ("check" or "checks") AND ("name" w/10 ("President" or "President's"));
Search 2: ("EIP" or "Economic Impact Payment") AND ("check" or "checks") AND "memo" AND ("line" OR "lines" OR "field");
Search 3: ("EIP" or "Economic Impact Payment") AND ("check" or "checks") AND ("signature" w/10 ("President" or "President's"));
Search 4: ("check" or "checks") AND ("mock-up" or "mock-up" or "mockup" or "mockups" or "mock up" or "mock ups" or "image" or "images" or "memo line" or "memo lines" ) AND ("name" w/10 ("President" or "President's"));
Search 5: ("check" or "checks") AND ("mock-up" or "mock-up" or "mockup" or "mockups" or "mock up" or "mock ups" or "image" or "images" or "memo line" or "memo lines" ) AND ("signature" w/10 ("President" or "President's")).

14.     On January 15, 2021, Treasury made its fourth production to Plaintiffs, consisting of 61 responsive pages, portions of which Treasury explained that it had withheld pursuant to FOIA Exemptions 5 and 6.  At this time, Treasury also explained that it had withheld in full under Exemption 5 an additional 56 responsive pages.  A true and accurate copy of the letter accompanying this production is attached hereto as Exhibit F.

15.     As part of the parties' negotiations to resolve the issues in dispute following these four productions, Treasury agreed to provide Plaintiffs with a draft index of pages withheld in full pursuant to Exemption 5, *see* Sixth Joint Status Report ¶ 3, ECF No. 14, and later agreed to issue a discretionary release of certain pages previously withheld in full, *see* Ninth Joint Status Report ¶ 3, ECF No. 17.

16.     On April 30, 2021, Treasury made its fifth production to Plaintiffs, consisting of a discretionary release of 16 pages of documents depicting preliminary draft designs of the EIP checks. *See* Tenth Joint Status Report ¶ 3, ECF No. 18.

17.     As a further result of the parties' efforts to narrow the issues in dispute, Plaintiffs agreed that they would not challenge the adequacy of Treasury's search or any withholdings pursuant to FOIA Exemption 6.  *See* Sixth Joint Status Report ¶ 3, ECF No. 14.  Accordingly, the only documents that remain at issue are those withheld in part or in full pursuant to Exemption 5.  *See* Tenth Joint Status Report ¶ 4, ECF No. 18.

18.     In all cases, Exemption 5 was applied solely to internal or intragovernmental communications; none of these communications were with third parties outside of the federal government.

19.     Applying Exemption 5 to these partially or fully withheld materials protects the deliberative process, encourages open and frank discussion among government officials, protects against premature disclosure of proposed policies before they are adopted, and protects against public confusion that may result from disclosure of rationales that were not in fact grounds for final decisions.

Release of the information withheld pursuant to Exemption 5 in this matter would cause reasonably foreseeable harm to Treasury in that it would chill similar future speech by Treasury officials. References to "Treasury" and "Treasury staff" in this declaration are meant to include the Bureau of the Fiscal Service and the Internal Revenue Service.

20.     The withheld material generally reflects internal, pre-decisional deliberations regarding Treasury's policies with respect to the rapid disbursement of billions of dollars of EIPs to provide relief to Americans as a result of the global COVID-19 pandemic. The withheld documents, or portions thereof, reflect opinions of Treasury officials and staff, up to and including the Secretary of the Treasury, at a time when Treasury's views and opinions were not fully developed and the issues were still being debated. None of the withheld information represents a statement of agency policy or a final decision.

21.     Release of these documents would have a chilling effect on the free exchange of opinions and ideas of Treasury officials and staff involved in future efforts to formulate policy. If Treasury officials and staff believe that such exchanges could become public in the event of litigation, they are unlikely to feel at liberty to offer their candid opinions. The reluctance of Treasury officials and staff to share their candid opinions, and the bases for them, would restrict Treasury's ability to formulate policies, interact with other agencies and lawmakers, fully develop policies and strategies, and effectively respond to future crises. This would adversely affect Treasury's ability to devise and execute policies that best represent the interests of the U.S. government and U.S. taxpayers.

22.     In addition, because these documents represent the internal deliberations of Treasury officials and staff prior to the Department's adoption of an official position, disclosure of the views or opinions of individual Treasury officials and staff could suggest rationales for Treasury's policies and decisions that may or may not have been relied upon as a basis for final policy positions and

decisions. The policy decision-making process is iterative. Preliminary opinions and analyses contained in these documents may not have been taken into account in developing, or formed the bases for, any of the determinations that Treasury subsequently made. Requiring disclosure of proposed policies could also cause confusion regarding why a certain policy has been adopted or will be adopted when, in fact, it might not be adopted at all.

23.     For the reasons described above, it is necessary to protect the confidentiality of pre-decisional agency deliberations. The Government's need for a properly functioning policy process outweighs Plaintiffs' need for this information.

24.     Protection of communications subject to attorney-client privilege likewise serves Exemption 5's goals of open and frank discussion while also furthering the public's interest in government officials seeking and obtaining sound legal advice from their attorneys. Sound legal advice depends on the attorney being fully informed by the client. In order to foster the delivery of fully informed legal advice, it is important that protection of attorney-client privilege under Exemption 5 encompass not only facts divulged by government officials to the government's attorneys, but also opinions given by the attorneys based upon and reflecting those facts as well as communications between attorneys that reflect client-supplied information. Release of materials withheld as subject to attorney-client privilege under Exemption 5 would cause reasonably foreseeable harm to Treasury by hindering the Department's ability to receive sound and fully informed legal advice from its attorneys. Such legal advice depends on open and frank attorney-client discussions, which would be chilled by the release of material appropriately subject to attorney-client privilege.

25.     Treasury has withheld under Exemption 5 information protected by the deliberative process privilege and the attorney-client privilege. These withholdings include: (1) discussions among staff, primarily at Treasury and the Bureau of Fiscal Service, concerning the development of a strategy for responding to media inquiries; (2) pre-decisional discussions regarding proposed content of the

memo and signatures lines of EIP checks; (3) draft materials created pursuant to these pre-decisional discussions; (4) discussion among staff at Treasury and the Bureau of Fiscal Service concerning recommendations for notice, timing, and other policy decisions related to the EIP checks; and (5) confidential communications between one or more attorneys and their clients relating to legal advice sought by the clients, which are subject to attorney-client privilege.

26.     The first category of Exemption 5 withholdings involves discussions among staff concerning the development of a strategy for responding to media inquiries. Treasury received various media inquiries related to the decision to include the President's name on the memo line of the EIP checks, including any effect this might have on the timing of check distribution. The withheld discussions involve the development of a strategy for responding to these inquiries. These discussions are deliberative because they involve recommendations of staff. These discussions are pre-decisional because they informed senior decision-makers such as the Assistant Secretary for Public Affairs. Disclosure of these discussions would risk public confusion because the media response ultimately delivered may be different from others discussed and considered by Treasury officials.  In addition, these discussions involve the development of recommendations to senior officials regarding a matter of widespread public and media interest.  Thus, disclosure would risk harm to future internal, pre-decisional deliberations by inhibiting full and frank discussion amongst Treasury staff on matters of significant interest relating to media inquiries.  Indeed, officials would have particular reason to be guarded in their discussions about how to respond to the media if such discussions were to be released. The very nature of these communications makes them more likely to become the subject of publication and media scrutiny. The chilling effect that would result from release would impair the quality of future decision-making, particularly with respect to media and other similar inquiries.

27.     The second category of Exemption 5 withholdings involves pre-decisional and deliberative discussions among Treasury staff concerning the proposed content of the memo and

signature lines of the Economic Impact Payment checks.  These discussions are pre-decisional because they involve the development of recommendations to inform the decision about the final design of the Economic Impact Payment checks, including the contents of the memo line.  These discussions are deliberative because they involve the recommendations and analysis of various Treasury staff members with respect to issues related to the information presented on the Economic Impact Payment checks upon their distribution, rather than the Department's final determination of how to proceed.  Disclosure of these discussions concerning a matter of such widespread public and media interest would impair the quality of future decision-making by discouraging the full and frank exchange of recommendations and viewpoints among Treasury staff on matters of significant public and media interest.  If Treasury staff are unable to candidly discuss the pros and cons of the design and content of information distributed to the public at large, the quality of advice on such matters will foreseeably decline.  Candid exchange among staff is essential to develop the highest-quality recommendations to senior decision-makers at Treasury.

28.    The third category of Exemption 5 withholdings involves pre-decisional and deliberative draft analysis of various questions concerning the design of the Economic Impact Payment checks. This information is deliberative because it involves the back and forth intra-agency review and discussion of draft analysis of issues pertaining to the design and content of Economic Impact Payment checks. This information is pre-decisional because it involves the development of analysis presented to senior officials to inform their decision-making regarding the contents of the checks. Because this information involves the back and forth intra-agency review and discussion of draft analysis to be presented to senior officials, disclosure would risk chilling future internal deliberations on similar matters of widespread public and media interest. The quality of agency decision-making depends upon the candid exchange of recommendations among agency staff. As with the category discussed above, these concerns are heightened with respect to complex matters

of significant public and media interest. Disclosing deliberative discussions revealing individual views and ideas would undermine the willingness of staff to participate in full and frank discussions in the future, particularly with respect to matters that may draw significant media interest. Moreover, release of draft discussions would risk public confusion about the final position and reasoning of the agency because the design and information ultimately delivered to the public and basis for those ultimate selections may be different from others discussed and considered by Treasury officials.

29.     The fourth category includes discussion and related draft materials shared among Treasury staff concerning recommendations with respect to notice, timing, and other policy decisions related to the logistics of distributing Economic Impact Payment checks.  These logistical discussions are pre-decisional because they involve the development of recommendations about these considerations to inform decision-making on these logistical issues concerning the Economic Impact Payment checks.   These discussions are deliberative because they involve the personal recommendations and analysis of various Treasury staff members with respect to various issues involved.  Disclosure of these discussions concerning a matter of such widespread public and media interest would impair the quality of future decision-making by discouraging the full and frank exchange of recommendations and viewpoints among Treasury staff, particularly with respect to logistically complex matters affecting millions of Americans.  This candid exchange among staff is essential to develop the highest-quality recommendations to senior  decision-makers at Treasury.  Discussions regarding the implementation of such initiatives benefit from confidence among staff that they will not face public ridicule for suggesting options that later appear misguided or for voicing unpopular criticism of one set of potential policy choices or implementation procedures.

30.     Finally, Treasury withheld information in twelve documents pursuant to the attorney-client privilege.  A senior official from the Bureau of the Fiscal Service requested from Treasury

attorneys an analysis of potential legal questions involved in considering options for the design of the EIP checks. In performing this analysis, Treasury attorneys consulted with an attorney at the Internal Revenue Service. Accordingly, these communications include internal email chains among senior attorneys at Treasury, the Bureau of the Fiscal Service, and the IRS, containing legal analysis of potential issues regarding the potential content of the memo line of EIP checks, the signature on the checks, and the related media strategy. These communications also include an email from an IRS attorney to senior attorneys at Treasury providing requested legal analysis of potential issues concerning the contents of the memo line of EIP checks and related proposed documentation. These discussions involve confidential legal analysis performed at the request of a senior Treasury official to inform senior decision-making about the design of the EIP checks. Disclosure of such privileged communications would impair the ability of senior Treasury officials to obtain candid legal advice. Such advice is essential for senior officials to make fully informed decisions.

31.    In processing the Request, Treasury took steps to ensure that all reasonably segregable non-exempt information responsive to Plaintiff's Request was released. All information withheld either was exempt from disclosure pursuant to a FOIA exemption or was so intertwined with protected material that segregation was not possible without revealing the underlying protected material.

32.    I am attaching to this declaration as Exhibit G an index describing the information withheld and the basis for these withholdings, as well as a set of documents reflecting Treasury's final withholdings in the material challenged by Plaintiff, Exhibit H.

33.    I declare under penalty of perjury that the matters set forth in this Declaration are true and correct to the best of my knowledge, information, and belief.


Executed this 16th day of July, 2021



_____
Michelle A. Dickerman
Deputy Assistant General Counsel for Litigation,
    Oversight, and Financial Stability
Office of the General Counsel
U.S. Department of the Treasury